Filed 6/25/15  In re Andrew C. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| In re Andrew C., a Person Coming Under The Juvenile Court Law. | |
| BARBARA C., Petitioner, v. THE SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent; CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, Real Party in Interest. | A144926 (Contra Costa County Super. Ct. No. J13-00526) |

Petitioner Barbara C. (Mother), mother of 10-year-old Andrew C.,[1] seeks review by extraordinary writ, pursuant to California Rules of Court, rule 8.452, of the juvenile court's findings and orders, in which the court terminated reunification services and set the matter for a permanency planning hearing, pursuant to Welfare and Institutions Code section 366.26.[2]  Mother contends (1) there is insufficient evidence to support the juvenile court's finding that return of Andrew to her custody would create a substantial

---

[1] Mother is Andrew's maternal grandmother.  She adopted him in 2008 after his parents, who had substance abuse issues, were unable to complete their case plan.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

risk of detriment to Andrew's physical or emotional well-being, and (2) counsel for the Contra Costa County Children and Family Services Bureau (Bureau) committed misconduct. We shall deny the petition for extraordinary writ.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 1, 2013, the Bureau filed an original petition alleging that Andrew came within the provisions of section 300, subdivision (b), in that that he was at substantial risk of suffering serious harm as a result of Mother's mental illness and problem with alcohol use. In particular, the petition alleged that Mother had been placed in a psychiatric hospital for five days in March and 11 days in April, after experiencing auditory hallucinations. Then, in April, she "was acting strange, seeing witches in people, and driving erratically with the child in the car." While experiencing auditory hallucinations, she had "stopped her vehicle at an intersection, slammed a police officer's arm in the door, and struck him with her fist in his chest as he tried to take the keys out of the vehicle. The child was in the front passenger seat during the incident." Mother had also refused to take the medication prescribed by her psychiatrist to stabilize her mental health and was unwilling to stop drinking alcohol even though, when she drank alcohol, she had auditory hallucinations.

On May 2, 2013, the juvenile court ordered Andrew detained in the home of a relative. Subsequently, at the conclusion of the June 13, 2013 jurisdiction hearing, the court sustained the allegations in the petition and took jurisdiction over Andrew, declaring him a dependent of the juvenile court.

In the disposition report dated July 9, 2013, and filed on August 20, the social worker reported that Mother suffered from bipolar disorder with "psychosis symptoms." Since her most recent hospitalization, Mother had continued her medication regimen and followed all of her psychiatrist's treatment recommendations. She understood "the need to be vigilant about administering her prescribed psychotropic medication and refraining from drinking alcohol." She had been taking her medication daily, testing clean, attending weekly 12-step meetings, and meeting with her psychologist every two weeks. Mother was symptom free and capable of providing adequate care for Andrew. Andrew

had enjoyed being with his great-aunt and uncle, but was ready to return to Mother's care. Because the Bureau believed there was a low risk to Andrew's safety, it recommended that the court return him to Mother, with family maintenance services.

On August 20, 2013, the juvenile court adopted the recommendations of the Bureau and returned Andrew to his mother's care, with family maintenance services.

On October 23, 2013, the Bureau again detained Andrew and filed a supplemental petition, pursuant to section 387, alleging that mother had failed to comply with her case plan by not taking her medication and missing a drug test. On October 16, it was reported that she had been behaving in a disoriented, rambling and paranoid way. On October 17, she had arrived two hours late to pick Andrew up from school, displaying agitated behavior. Andrew also had four unexcused absences from school between October 15 and October 21. Finally, during an October 21 welfare check at the home, Andrew had reported being scared. He said that Mother was " 'acting strange again and not making sense,' " and that she had " 'grabbed my arm really hard for no reason when we were outside walking and would not let go when I said it hurt me.' "

On October 24, 2013, the juvenile court again ordered Andrew detained.

In a memorandum filed on November 14, 2013, the social worker related that, during the October 21 visit to the home, he had spoken with Andrew privately. Andrew began to cry and said he did not want to leave his mother, but that she was "acting so 'weird' again." When the social worker asked if he wanted to visit his aunt, he said "yes." When the social worker went to speak to Mother, Mother refused to cooperate and the social worker said he would have to call the police. When he did so, Mother "immediately rushed up to the [social worker,] yelling at the top of her voice to get out of her home," and postured "like she was ready to assault the [social worker]." Eventually, Andrew was taken to the home of his aunt. The social worker reported that it appeared that Mother "was at the beginning of another mental health break due to her poor self management of her medication." Andrew was happy to be residing with his aunt, had returned to school, and was hopeful that his mother could get the help she needed. The

3

Bureau believed that Mother had failed her family maintenance program and requested that Andrew be removed and placed into the care of his paternal aunt.

Also on November 14, 2013, the juvenile court sustained the supplemental petition.

In the December 12, 2013 disposition report, the social worker reported that the Bureau had made repeated attempts to reach Mother by phone, email, and letter, but she had not responded to those attempts. She had not visited with Andrew since the most recent removal in October. Andrew had adjusted well to his placement, and the school had reported that his behavior had much improved since he had been in his great aunt's care.[3] Andrew was happy living with his great aunt and great uncle, whom he had known his entire life. He had communicated to the social worker that he was open to having their home become permanent for him, and the great aunt and great uncle were willing to consider guardianship or adoption.

At the December 12, 2013 disposition hearing on the supplemental petition, the juvenile court terminated Mother's family maintenance services and set a review hearing for May 2014.

In the May 22, 2014 status review report, the social worker related that, after more than three months without contact, mother had sent an email to the social worker on February 1, 2014, explaining that she had been in a house fire; asking about Andrew; and stating she wished to again begin receiving Andrew's monthly disability benefits, which the Social Security Administration had informed her would cease due to his being in foster care. Since then, Mother had been cooperative with the Bureau and had been diligent regarding her case plan responsibilities, including testing negative on all submitted tests, attending 12-step meetings, administering her medications, and regularly meeting with her psychiatrist and therapist. She had also had weekly phone visits and one in-person visit with Andrew. Andrew was thriving in the home of his great-aunt and

_____

[3] The social worker reported that Andrew suffered from ADHD (attention deficit hyperactivity disorder), and had delays in academic performance and socialization.

great-uncle, and was "aware of the situation with his mother and understands why he was removed." He had told the social worker that, "while he loves his mother, it is best if he remain[s] with his aunt." Since they had been in contact again, he had been asking about Mother more often and said he would like to continue to visit with her.

The Bureau recommended that the court continue the dependency and order reunification services for Mother.

On May 23, 2014, the juvenile court ordered reunification services for Mother.

In a December 2, 2014 status review report, the social worker related that Mother now had twice-weekly phone calls and twice-monthly supervised visits with Andrew. Mother had been working on her case plan since February, and had tested negative on all random tests, attended 12-step meetings as required, and met regularly with a psychiatrist and therapist. Mother also had apparently been hospitalized twice, in October 2013, and January 2014, while out of contact with the Bureau. A letter from her most recent psychiatrist reflected that Mother had not informed him of these involuntary hospitalizations. The Bureau also learned that Mother had set the previously reported house fire in a suicide attempt; Mother had said she "wanted to die because she wanted to be saved from going to hell."

Andrew continued to thrive in the care of his great aunt and other relatives, all of whom had a previous relationship with Andrew and who provided him with a safe and consistent environment. He was taking his ADHD medication and his school performance was improving; he presented as calmer and more focused. Andrew also understood the situation with Mother and consistently reported feeling safe in his relatives' care, all of whom showed him a great deal of attention and love. He told the social worker that he wanted "to stay here and go with mom when she is ' "fully, fully better." ' " A visit supervisor had told the social worker that Mother had always been appropriate with Andrew during visits. She also said, however, that Mother "wants to engage but doesn't appear to know how," and expressed concern about "what will happen if Andrew is returned to her care again."

5

The Bureau recognized that Mother had "the ability to function while on her medication. However, if she does not take her medication, or drinks alcohol as she has done previously, the child is placed at severe risk. Andrew has endured a tremendous amount of distress and detriment while in the mother's care during her psychotic breaks." The Bureau believed it would be dangerous for Andrew to be returned to Mother's care, "given her fragile mental state, her inability to sustain her mental health for a prolonged period of time, and what appears to be her failure to disclose to the physician monitoring her medication . . . her two most recent psychiatric hospitalizations." The Bureau therefore recommended that the court terminate Mother's reunification services and set a section 366.26 hearing.

In a status review report filed on April 9, 2015, the social worker related that, although Mother had been compliant with her case plan for over a year, she had never acknowledged starting the fire at her home or her two psychiatric hospitalizations during the time she was out of contact with the Bureau. Her twice-weekly phone calls with Andrew had been terminated after she offered Andrew a new PlayStation if he moved back to her home. Andrew said he "really loves it where he is living now," with two great-aunts and a great-uncle, and that he " 'would like living with [Mother] when she gets better and when she quits smoking.' " By " 'gets better,' " he said he meant, " '[u]ntil she is ready to take care of me again and not burn my food, learn not to keep me up at night and not let me watch videos on the computer all the time. She needs to tell me to go to bed.' "

The social worker also reported that, at a January 10, 2015 hearing, the court had been informed of a phone call in which Mother had asked Andrew "why he was lying to her." Finally, Mother did not support Andrew's current placement because she believed that, as three single, adult siblings, his caretakers had "certain lifestyles that are not conducive to raising a child."

At the combined 12- and 18-month hearing, which took place on April 9, 2015, Todd Lenz, who was the social worker on the case from June 2013 until September 2014, testified that Mother had stayed in contact with him between February and September

6

2014, and had participated in her case plan during that period. In May 2014, Lenz had received a letter from Mother's then-psychiatrist, in which he wrote that he would "strongly recommend" that Mother "be considered to regain custody of Andrew."

When asked why he did not recommend that Andrew be returned to Mother, given that she was in compliance with her case plan, Lenz responded that she was cooperative and able to comply with what the Bureau was asking of her when she was on her medication. The concern was when she was off of her medication and, "because it was a second removal, the concern was we didn't want to traumatize the child anymore. [¶] You know, she does well when the child is not in the home. It's when the child is in the home that she struggles with her mental health."[4]

Mother testified that her situation had changed since Andrew was removed from her care for the second time. She now understood what her problem was; she was medication compliant; she was seeing her therapist every two weeks, and would continue to do so if Andrew came home. Mother had been compliant with her case plan for more than a year and believed that she was well now. In particular, she explained, "I had fixated on this person that was previously in my life" and had been "an influence" in her life 25 years previously. And she had "fixed that by actually meeting with him."

At the conclusion of the hearing, the court commented on Mother's inappropriate facial expressions in the courtroom, including "smiles" and "smirks," during a discussion of Andrew's fear of going home. The court then found that Mother had "no insight into her behavior. . . . [¶] I don't think she's a bit grateful for somebody taking care of this child while she herself was in total disarray. . . . I didn't sense anything in that except hostility. [¶] And that bothers me so much, because I think her lack of insight into her behavior is part of whatever mental issues she has; lack of insight into the frightening behavior, lack of insight into what her behavior did to her son, this crazy stuff he

---

[4] Three other social workers who also worked with Andrew and Mother for a short time testified at the hearing as well.

witnessed, this crazy stuff he heard, this scary stuff he heard, the things that he had to do and see.

"I don't think she has any insight into that. And, frankly, I haven't sensed a sense of accountability for it, for this child. [¶] . . . [¶] I think there's a lot of credibility issues with [Mother]. But sometimes I don't know whether it's something she just doesn't choose to remember, whether she can't remember, whether she dreams it up another way, or whether it's intentional. I think some of it's intentional. [¶]

"I do not find the child to be safe in [Mother's] home, not for a second. And I'm sorry about it, but I think it's a very big reality. . . . [¶] . . . [¶] . . . I think you wish him well but I don't think you have any concept of his—he's well now, not in your home, and that you have issues that are still evident to this court.

"I am very concerned about some of the testimony of what she did and did not tell the psychiatrist and what she chooses to share. But it all goes into the issue of credibility and the lack of insight into what . . . her issues are.

"So I'm going to follow the recommendations. I think they are very appropriate. I'm not giving family maintenance. It's been 23 months. Enough is enough. [¶] I think it's very important for this young boy not to have this being torn all the time. And I think this has been a terrible, terrible time for him. [¶] So I am setting a 366.26."

On April 15, 2015, Mother filed a notice of intent to file writ petition.[5]

## DISCUSSION

### I. *Substantial Risk of Detriment*

Mother contends substantial evidence does not support the juvenile court's finding that return of Andrew to her custody would create a substantial risk of detriment to Andrew's physical or emotional well-being.

Section 366.22, subdivision (a), directs that, if the juvenile court finds, by a preponderance of the evidence, that return of a child to his or her parent "would create a

---

[5] On May 28, 2015, Mother filed a petition seeking review of the juvenile court's orders and requesting a stay of the section 366.26 hearing pending determination of this petition.

8

substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child," the court must terminate reunification services and hold a section 366.26 hearing within 18 months after the date the child was removed from the parent's physical custody, upon a finding that reasonable services were offered or provided. This "substantial detriment" standard " 'must be construed as a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' It must mean what it says: that return presents a *substantial* risk of detriment to the child." (*Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 505.)

Our review of the juvenile court's finding of detriment involves reviewing the record to determine whether there is "substantial evidence in support of the finding." (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.)

Mother argues that because she fully complied with the requirements of her case plan, the juvenile court's detriment finding was not supported by substantial evidence. While compliance with the case plan "is certainly a pertinent consideration at the section 366.22 hearing[,] it is not the sole concern before the dependency court judge." (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704.) Other factors that the juvenile court can consider include, inter alia, a parent's limited awareness of the emotional and physical needs of the child, the manner in which the parent has conducted herself in relation to the child in the past, and whether returning the child to the parent's custody "will be detrimental because severing a positive loving relationship with the foster family will cause serious, long-term emotional harm." (*Id.* at pp. 704-705.) Thus, as another appellate court put it in a similar context, "[t]he juvenile court ha[s] the duty to evaluate [the parent's] efforts against his previous failings, and, more importantly, to evaluate the likelihood that he would be able to maintain a stable, sober and noncriminal lifestyle for the remainder of [his child's] childhood. [The parent's] belated compliance with reunification services is not definitive on this issue." (*In re Brian R.* (1991) 2 Cal.App.4th 904, 918.)

9

In the present case, it is undisputed that, at the time of the hearing, Mother had been working diligently on her case plan for over a year, ever since she resumed contact with the Bureau in February 2014. She was medication compliant, regularly met with her therapist and psychiatrist, submitted to random testing, regularly attended a 12-step program, and participated in supervised visits with Andrew. Her psychiatrist had recommended that the court consider returning Andrew to her care.

Despite this evidence of Mother's commendable efforts on her own and Andrew's behalf, we conclude that substantial evidence supports the juvenile court's finding that return to Mother's custody would be detrimental to Andrew. As a panel of this Division stated in *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141-1142: "Availing herself of the services provided is one consideration under section 366.22, subdivision (a), but under this statute the court must also consider progress the parent has made towards eliminating the conditions leading to the children's placement out of the home."

First, the juvenile court observed Mother's behavior and testimony in court and noted her "really inappropriate facial expressions"; she was smirking, smiling, and laughing at inappropriate times, and "giving everybody dirty looks." The court also found that Mother had no insight into her "frightening behavior" and "what her behavior did to her son," and that she had no sense of accountability for Andrew, who had improved greatly since he began living with his great aunts and great uncle, with whom he felt safe. Andrew was fearful of going home and did not want to return to Mother until she was " 'fully, fully better.' "[6] The court further found that there were "a lot of credibility issues" with Mother, including evidence that she had not told her psychiatrist or the social worker about her two most recent hospitalizations or about setting the house fire.

---

[6] The court also observed that Andrew, who had been interacting with Mother during visits and phone calls, "knows whether she's better or not." Indeed, phone contact between Mother and Andrew had been terminated due to Mother's inappropriate comments, including offering to buy Andrew a PlayStation if he came home and accusing him of lying to her.

10

In addition, the social worker who had been on the case longest expressed concern that she struggled with her mental health when Andrew was in her home and that he did not want Andrew to be traumatized anymore. A visit supervisor had told the social worker that, during visits, Mother "wants to engage but doesn't appear to know how," and had expressed concern regarding "what will happen if Andrew is returned to her care again."[7]

In sum, substantial evidence supports the juvenile court's conclusion that, nearly two years after Andrew was first removed from Mother's home, Mother had not eliminated the conditions that led to the out-of-home placement. The court reasonably concluded that return of Andrew to Mother's care would create a substantial risk of detriment, subjecting him to a precarious situation in which Mother would be at risk for another mental break that would endanger him both physically and emotionally. (See § 366.22, subd. (a); *In re Dustin R.*, *supra*, 54 Cal.App.4th at pp. 1141-1142 *Angela S. v. Superior Court*, *supra*, 36 Cal.App.4th at p. 763; see also *Constance K. v. Superior Court*, *supra*, 61 Cal.App.4th at p.709.)

## II. *Alleged Misconduct*

Mother contends the Bureau's counsel committed misconduct when she stated in her closing argument at the April 9, 2015 hearing, that Mother "also accused Andrew of lying." According to Mother, this false and inflammatory statement was "absolutely unsupported by the evidence." Mother is mistaken.

---

[7] Mother relies on *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 and *In re Yvonne W.* (2008) 165 Cal.App.4th 1394 for the proposition that, because she completed her case plan, the juvenile court was required to return Andrew to her care. Neither case is analogous to the present one. In *David B.*, the appellate court criticized the juvenile court for focusing on insignificant details regarding the father's parenting abilities, rather than on whether the child's "safety, protection, or physical or emotional well-being would be placed at substantial risk in [the father's] care." (*Id.* at p. 790.) In *In re Yvonne W.*, the juvenile court had improperly found detriment based solely on the fact that the mother was living in a long-term shelter, which the child did not want to do. (*Id.* at p. 1401.) As already discussed, unlike *David B.* and *In re Yvonne W.*, this case involves much more than minor flaws in parenting styles or imperfect living situations.

The record reflects that, in the April 9, 2015 status review report, the social worker reported that, at an earlier hearing, the court had been informed of a phone call in which Mother had asked Andrew "why he was lying to her." In addition, at the April 9 hearing, one of the social workers, Crystal Gabriel, testified about the phone conversation in which Mother "told Andrew he was lying." There was no misconduct on the part of the Bureau's counsel.

## DISPOSITION

The petition for extraordinary writ is denied on the merits. The request for a stay is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

 

                                            _____

                                            Kline, P.J.

We concur:

_____

Richman, J.

_____

Stewart, J.